|,SUSAN M. CHEHARDY, Judge.
This is a defamation suit in which the trial court ruled in favor of the plaintiff and awarded damages against several defendants. One of the defendants appeals. We affirm.
Rhonda Lee Johnson cohabited with Eugene R. “Gene” Camanga, Jr. for several years. One child was born of their relationship, a daughter, Nichole, on December 30,1987. Rhonda and Gene separated in 1991, when the child was four-and-a-half years old. During the first few years of her life Nichole spent a considerable amount of time with Gene’s parents, Dolores Camanga and Roy Camanga, even after Rhonda and Gene ended their cohabitation.
Sometime in 1992 disagreements arose between Rhonda and the elder Camangas over child-rearing techniques. Rhonda refused to allow the child to stay with the grandparents as she had previously done and placed her in day care. Gene filed a petition for custody, which resulted in a judgment granting joint custody of the child to Rhonda and Gene.
Subsequently Gene decided to seek full custody. His father, Roy Camanga, obtained a rap sheet from a friend in law enforcement that purported to show that Rhonda had been arrested for several crimes. In order to do so, Roy Camanga Lasked Rhonda for her Social Security number, on the pretext he wanted to use it to play the lottery.
In his petition for custody filed on December 21,1992, Gene alleged that Rhonda had been arrested for attempted crimes against nature, prostitution, and felony theft and that she had pleaded guilty to charges of prostitution. On the same date, Roy and Delores Camanga intervened in Gene’s custody proceeding with a pleading entitled “Petition For Relief Under Domestic Abuse Statute, Petition for Intervention and Petition for Custody,” in which they reiterated the allegations that Rhonda had a criminal history. They supported their son’s petition for sole custody and, alternatively, sought custody of the child themselves and sought relief under the Domestic Abuse Assistance statutes, La. R.S. 46:2131 et seq., for protection of the child.
Based on the allegations in the Camanga petitions, the district court signed an ex parte interim order granting interim custody to Roy and Delores Camanga.
In fact, the person named in the rap sheet was not Rhonda Lee Johnson, the plaintiff, but one Sheila Wilson alias Rhonda D. Johnson, who has a similar Social Security number. Rhonda Lee Johnson, the plaintiff, has no such criminal history. She was stationed in Europe on military duty at the time that Sheila Wilson a/k/a Rhonda D. Johnson was convicted.
After a hearing in January .1993, the trial court rendered an interim judgment granting Roy and Delores Camanga custody of the child, with Rhonda to have visitation. Following a full custody trial in November 1993, the court rendered judgment on November 2, 1993 granting Gene and Rhonda joint custody of the child, with each to have physical custody half the year and the other parent to have weekend and holiday visitation while the child was living with the other parent.
|40n December 20, 1993 Rhonda filed the petition in this matter, seeking dam *1143 ages for defamation.[1] The suit eventually went to trial in March 2002. The trial court rendered a written judgment on April 12, 2002, finding in favor of the plaintiff and awarding damages in the amount of $1,500.00 against Roy and Delores Ca-manga and in the amount of $7,500.00 against Eugene R. Camanga, Jr.
In lengthy oral reasons for judgment the trial court stated, in pertinent part:
I find that it is more probable than not, given the entire panoply of behavior ... that Mrs. Delores Camanga and Mr. Eugene Roy Camanga were present for that meeting between Benny Plaia and Harry Cabral and Gene Camanga, the biological father, since they were involved in everything before, during and since.
At any rate, it is uncontroverted that at that meeting a discussion was had where in it was discussed that the Social Security number for Rhonda Lee Johnson depicted in the rap sheet was not exactly the same as for the Rhonda Lee Johnson, the mother of the child....
Gene Camanga quite candidly testified that at the time in question ... he ... certainly knew her birth date ..., and the birth date depicted in the rap sheet is certainly not the same as the rap sheet of the Rhonda Lee Johnson before [this] Court....
* * *
On the contrary, it happened that Rhonda Lee Johnson ... was one of those people who went to work everyday and had the same job for years and years, and lived a relatively sane existence.
[[Image here]]
It is relatively uncontroverted that the Camangas knew, that Gene Camanga, because it is uncontroverted that he was involved in the conversation with Cabral and Plaia, knew or should have known that this was not the same Rhonda Lee Johnson.
I find ... it is more probable than not that the older Camangas likewise were involved in this conversation, and at any rate all of them signed the affidavits attendant to the ex parte petition.... The petition which contained allegations of serious criminal conduct which is of a nature to include moral turpitude or immorality, and that Rthat being placed before the judge in an ex parte context is publication of the most serious, serious nature.
... [I]t was certainly placed in the petition in an attempt to convince a judicial officer to take a very, very serious act, which was to remove a child from a parent....
... [T]he allegation of prostitution, theft and crime against nature, when placed in the context of the balance of the allegations, cast Rhonda Lee Johnson in a light which was indefensible as a parent.
[[Image here]]
The defense makes much of the fact that upon receipt of this information [establishing Rhonda was not the subject in the rap sheet] they asked no questions on this issue, and from their perspective the issue died.
It is imperative to note that when one looks forward at Judge Zeno’s reasons *1144 for judgment, the issue did not die with regard to Judge Zeno.
... [T]he Camangas neither retracted the statement on the record, nor vacated that portion of their pleadings, nor filed amended pleadings deleting the untrue allegations. The pleadings sat in the record as they were from then to this day.
* * *
I must say parenthetically that Judge Zeno showed an incredible amount of restraint of not holding people in contempt of court for knowingly filing false statements in an ex parte motion.
[[Image here]]
This Court finds that there was actual malice. All three Camangas signed the pleadings, and all more probably than not knew that the information contained with regard to the three arrests was untrue....
* * *
... I find first, that the defendants knew ... the information contained in the rap sheet was probably untrue relative to this person; two, that the use of such highly volatile information in an ex parte pleading is extreme and dangerous; three, I find that the allegations placed in the ex parte petition were extreme and dangerous; I also find that the defendants knew or should have known that the distress to be suffered by any individual accused of such a crime when that individual has not engaged in such conduct would be severe, much less in a situation where it was intended by the defendants to result in the mother’s loss of her child.
U further find ... that she did indeed suffer severe emotional distress....
[[Image here]]
I certainly do find that the defamatory conduct credited to an overall atmosphere which resulted years later apparently in the mother losing custody of her child....
Now, interestingly Dolores and Roy Camanga were the people who were desperately seeking custody of their grandchild, but it was Gene Camanga who appears from the evidence to have been more intimately involved in the decision to place the language in the petition and so forth, and that will play into the awarding of damages.
[[Image here]]
At any rate, I can’t find that either the father or the grandparents engaged in this custody battle out of a sense of the best interest of the child. I find that it was engaged in, at least in the part that is before me, and that is the part that resulted in the defamatory conduct, just plain because they wanted the baby.
Gene Camanga alone has appealed. He assigns the following as errors.
1. The court erred in finding the appellant guilty of defamation after the presumption of malice for alleging immoral acts was rebutted by the testimony of the defendant and witnesses.
In his brief Gene states he cannot deny that he signed an affidavit containing a statement making false accusations against his former girlfriend and that, with reasonable diligence, he would have discovered that the allegations were false. He admits he would be guilty of defamation per se “if these constituted the total of facts surrounding this story.” He contends he did not file the court documents with a malicious purpose, but because he was doing so in the best interest of his child.
*1145 He also asserts that he and his parents were pressured to include the arrest allegations by the elder Camangas’ then-attorney.[2] Gene notes that the attorney then representing him objected to the inclusions.
Gene further contends that his father and mother “clearly ... were at the forefront of this litigation at its inception and, until the final hearing in November |71993, reaped the greatest benefit from it.” He contends that the trial court “could and should have determined that the presumption of malice” arising from false allegations of criminality “was sufficiently rebutted.”
“To prevail on a claim of defamation, plaintiff has the burden of proving by a preponderance of the evidence five essential elements: defamatory words, publication, falsity, malice and resulting injury. If even one of these elements is absent, the cause of action fails.” Sommer v. State, Dept. of Transp. and Dev., 97-1929, p. 25 (La.App. 4 Cir. 3/29/00), 758 So.2d 923, 939, writ denied, 2000-1759, (La.10/27/00), 772 So.2d 122.
Defamatory words are those which tend to harm the reputation of another so as to lower him in the estimation of the community or to deter third persons from associating with him. To be actionable, the words must be communicated or published to someone other than the plaintiff. Words that expressly or implicitly accuse another of criminal conduct or that, by their nature, tend to injure one’s personal or professional reputation are considered defamatory per se. If the plaintiff proves publication of defamatory per se words, the elements of falsity, injury and malice are presumed, although they may be rebutted by the defendant. To rebut this presumption, defendants have the burden of proving a reasonable belief in the truth of the statements. [Citations omitted.]
Doe v. Grant, 01-0175 (La.App. 4 Cir. 1/29/03), 839 So.2d 408, 2003 La.App. LEXIS 181, citing Sommer, 97-1929, p. 29, 758 So.2d at 940.
[0]n appellate review of a factual determination, the reviewing court may not set aside the factfinder’s findings of fact in the absence of manifest error or unless they are clearly wrong. Also, where there is a conflict in the testimony, reasonable evaluations of credibility and reasonable inferences of fact should not be disturbed upon review, even though the appellate court may feel that its own evaluations and inferences are as reasonable. Rosell v. ESCO, 549 So.2d 840 (La.1989); Arceneaux v. Domingue, 365 So.2d 1330 (La.1978); Canter v. Koehring Co., 283 So.2d 716 (La.1973).
Johnson v. State Farm Mut. Auto. Ins. Co., 95-1027, pp. 3-4 (La.App. 5 Cir. 5/15/96), 675 So.2d 1161, 1162-1163.
The trial judge’s exhaustive reasons for judgment, quoted in part above, establish that she found that the defendants published information that was defamatory per se and that they had no reasonable belief in the truth of the statements. Hence, they failed to rebut the presumption. We find no manifest error in that determination and, thus, no merit to this assignment of error.
2. The court erred in failing to state a level of comparative negligence for the defendants and assigning a disproportionate amount of damages per defendant.
Here Gene complains that the court assessed the damages unequally *1146 among the defendants without apportioning degrees of fault. As mentioned above, the elder Camangas were held liable for $1,500.00 and Gene Camanga liable for $7,500.00, for a total of $9,000.00. Gene asserts that under Louisiana law the court must apportion degrees of fault specifically among multiple defendants. He asserts, “The facts indicate ... that the elder Ca-mangas, through and with their attorney, were at the forefront of this litigation, and certainly should bear at least an equal portion of the fault if not a significantly greater one.”
Gene contends his parents should bear the greater share of the fault and should have been assessed at least 65% of the damages.
La.C.C.P. art.1917, read in conjunction with La.C.C.P. art. 1812(C), provides that in nonjury cases to recover damages for injury, death or loss, the court shall make specific findings that shall include the degree of fault, expressed in percentage.
Here the trial court in fact addressed the issue of the disproportionate damages with her statement, “Dolores and Roy Ca-manga were the people who were desperately seeking custody of their grandchild, but it was Gene Camanga |3who appears from the evidence to have been more intimately involved in the decision to place the language in the petition and so forth, and that will play into the awarding of damages.”
However, the court failed to make a specific finding as to the degree of fault, expressed in percentage, as required by La.C.C.P. art.1917 and 1812(C). The total of the damages awarded was $9,000.00; the court allocated $7,500.00 to Gene Ca-manga and $1,500.00 to Roy and Delores Camanga. In proportion to the total, Gene Camanga was liable for 83.33% of the damages and the elder Camangas were liable for 16.67% of the award.
Technically, the court’s failure to apportion the damages between the defendants by percentage was a legal error. Johnson v. State Farm Mut. Auto. Ins. Co., 95-1027, pp. 3-4 (La.App. 5 Cir. 5/15/96), 675 So.2d 1161, 1162-1163.
However, we do not find it requires either reversal or amendment. Considering the testimony and evidence, the reasons set out by the trial judge sufficiently addressed the apportionment of damages and we find no reason to change the ratio allocated by the trial court. See Turner v. D’Amico, 96-0624, p. 3 (La.App. 1 Cir. 9/19/97), 701 So.2d 236, 238.
Hence, we find no merit to this assignment.
3. The court granted excessive damages for the extent of the injuries proven in trial.
The appellant contends the amount awarded is “far in excess of a reasonable amount of damages for what was proven in court, considering the amounts awarded in cases around the state for similar offenses.” He states that the plaintiff testified at trial that she was devastated, shocked and embarrassed, but she did not seek therapy from any mental health specialists. He also asserts she did not suffer any damage to her reputation because her friends only learned of the allegation |infrom the plaintiff herself and they testified it did not change their opinion of her. He notes the friends testified the plaintiff was upset, lost sleep and lost weight during the course of the entire custody battle and the allegations. Gene asserts, “Our court system would grind to a halt if everyone who suffered fantods over custody battles could file tort actions against their spouses or ‘significant others.’ ”
*1147 Gene contends that although the trial court tried to determine the effect the eomplained-of allegations had on the custody court’s decision to grant ex part custody, but that is difficult. He notes, once Rhonda presented clear proof she was not the person named in the rap sheet, it was never again used as a basis to maintain custody with the grandparents. He asserts, “Thus, at its worst, the allegation contributed, along with the other allegations, to the removal of the child from the mother for a period of no more than a few weeks.” He argues that Rhonda’s reactions were due to the overall circumstances, not just to the arrest allegations.
Gene acknowledges that the trial judge “was most concerned that the affidavit and petition containing the offensive allegation was used to procure an order depriving a mother of her child.” However, he contends, the proper remedy for that is sanctions under La.C.C.P. art. 863, brought before the judge who tried the custody matter.
We disagree. The type of allegations made against the plaintiff are not protected because they appeared in legal pleadings. They were defamatory per se and the plaintiff was entitled to recover for them. The sanctions that may be levied under La.C.C.P. art. 863 are for false verification of pleadings, regardless whether the material thus falsely attested to is defamatory. Article 863 sanctions may offer an additional route for a defamed party to hold the opponent responsible for his or her actions, but do not provide recovery for the tort of defamation.
In Regarding the amount of the award, the trial judge discussed the awards in several other defamation cases, ranging from $500.00 to $90,000.00. We find no abuse of discretion in the amount awarded here.
For the foregoing reasons, the judgment of the district court is affirmed. The appellant is cast for the costs of this appeal.

AFFIRMED.

. The Jefferson Parish Sheriff, Harry Lee, was originally named a defendant in connection with release of the rap sheet, but the plaintiff later voluntarily dismissed him from the case without prejudice, reserving her rights against the other parties.

. At that time the elder Camangas were represented by the late Harry Cabral, whom the appellant characterizes as “by reputation a most aggressive domestic attorney.'1